# EXHIBIT NO. 1

# DEFENDANTS' FEBRUARY 25, 2010 STATEMENTS

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    02/26/2010

ALFRED EDWARDS, JR., (hereafter, EDWARDS), born: ; of ; Social Security Account Number: ; telephone number: ; e-mail address: ; cellular telephone number: , was interviewed in the dining room of his residence. After being advised of the identity of the interviewing Agents, EDWARDS discussed the following:

EDWARDS was asked how he came to know TERESITA BUNUAN EDWARDS, (hereafter, TE). EDWARDS said TE came to the United States from the Philippines in the 1990s. TE traveled from the Philippines to the United States with JOCELYN RAZZO. EDWARDS described RAZZO as a friend of EDWARDS' wife (GLORIA EDWARDS, hereafter GE). EDWARDS said GE knew TE in the Philippines.

EDWARDS said TE met his brother, DAVID ALFRED EDWARDS (hereafter, DAVID), in the early-2000s. TE was attracted to DAVID and they fell in love. DAVID died in 2008 of Hydrocephalus (a condition described by EDWARDS as causing fluid to collect in the brain). The buildup of fluid caused pressure on DAVID's brain which resulted in brain damage, dementia, and eventual death. EDWARDS recalled TE and DAVID were married on August 14, 2000.

When asked if he knew MICHAEL REID, EDWARDS said he did. REID met TE while she was in the United States and EDWARDS said they were married in 1999. EDWARDS recalled originally meeting REID at the Officers Club at Bowling Air Force Base. EDWARDS also originally met TE at the Officer's Club at Bowling Air Force Base. EDWARDS described REID as a drug user (with extensive needle marks on his arms) and said REID had trouble staying employed. EDWARDS said TE originally stayed with REID in Washington, D. C. after her marriage to him. When she began having problems in the relationship she began to periodically stay at EDWARDS' house in Upper Marlboro, Maryland.

During one of her stays at EDWARDS' home, TE met DAVID. EDWARDS said REID was unable to keep a job because of his drug problems and TE eventually began staying at EDWARDS' residence for months at a time. When TE's marriage to REID did not work out, EDWARDS helped TE obtain a divorce from REID.

Investigation on    02/25/2010    at Upper Marlboro, Maryland

File # 50-BA-110763 -51    Date dictated 02/26/2010

by    SA CHRISTY A. SHAFFER &
SA BRIAN J. FITZELL:glwm

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

00019

FD-302a (Rev. 10-6-95)

50-BA-110763

Continuation of FD-302 of      ALFRED EDWARDS JR.                              , On  02/25/2010  , Page    2

     EDWARDS said getting a divorce in Washington, D. C. was very easy and lawyers did not need to get involved. After TE divorced REID, she married DAVID on 12/14/2000. After the wedding, TE and DAVID EDWARDS began residing permanently in EDWARDS' home.

     EDWARDS and GE took a trip to Israel and France in 2009 while TE stayed behind at their residence. TE continued to reside at EDWARDS' home after DAVID died. While on the Israel trip, TE talked on the phone with both EDWARDS and GE and told them she missed them while they were away. Despite these telephone conversations, TE left EDWARDS' home and was not there when EDWARDS returned from overseas. EDWARDS initiated a Missing Person Report for TE because he did not think she would leave his residence on her own.

     On 12/22/2009, EDWARDS received a telephone call from TE. EDWARDS answered the phone, recognized TE's voice, and gave the phone to GE. EDWARDS did not listen in on the call, but GE told EDWARDS about the call after she hung up. GE said TE told her EDWARDS had threatened to shoot her (TE) if she left the house. When asked, EDWARDS confirmed he had three firearms in the house; including a .357 magnum, a Walther P238, and a Smith & Wesson. EDWARDS said he never showed TE the guns, but she may have heard him speak to friends about the firearms.

     In addition, following the 12/22/2009 telephone call, GE told EDWARDS that TE accused GE of trying to stab her in the side with a knife.

     When asked to describe the living arrangement TE had with EDWARDS, EDWARDS said TE could not afford to pay him rent for living in his house. EDWARDS brought TE to Social Services at a Prince George's County facility and she began receiving $200.00 a month assistance. TE bought food with the $200.00 a month and the household shared all the food purchased. EDWARDS said the residents also shared in the cooking and cleaning responsibilities.

     EDWARDS charged TE $400.00 in rent to reside at his residence; although he never collected any money from her. EDWARDS indicated the $400.00 a month rental agreement was for the purpose of getting TE additional welfare assistance when she qualified for it. EDWARDS explained that although TE has a green card, (lawful, permanent resident status), she would not qualify for additional social services money until she had the green card for five years.

FD-302a (Rev. 10-6-95)

50-BA-110763

Continuation of FD-302 of ___ALFRED EDWARDS JR._____ , On _02/25/2010_ , Page __3__

Currently, TE was receiving food stamps and EDWARDS was helping TE pursue rental assistance.

When asked if TE inherited anything upon DAVID's death (either from life insurance or from the liquidation of his estate), EDWARDS said, to his knowledge, nobody received anything from the settlement of DAVID's estate.

When asked how the household chores are assigned in the house, EDWARDS said his mother-in-law washes the clothes and cleans, GE did some cleaning, and TE did some cleaning and most of the cooking.

When asked if he provided any money to TE's family members (who still reside in the Philippines), EDWARDS answered he had no knowledge of providing assistance to the Philippines.

When asked if TE was required to perform any services in exchange for residing at his residence, EDWARDS answered he was not able to recall any specific services agreement. EDWARDS called the arrangement between TE and EDWARDS "informal."

When asked if TE had any outside employment, EDWARDS admitted TE had occasional employment as a house-cleaner. TE cleaned houses for cash at approximately two to three houses in the neighborhood. EDWARDS never took any cash from TE generated from her outside employment.

EDWARDS said when TE married DAVID, EDWARDS helped with the paperwork and put TE in touch with Catholic Charities to oversee the process for her. EDWARDS recalled TE receiving her green card approximately three to four years ago, perhaps in 2006, while his brother, DAVID, was still alive.

When asked if he helped obtain a Philippine passport for TE, EDWARDS said he helped her fill out the application and obtain the pictures for the form.

When asked if he knew the current location of TE's passport, EDWARDS said it might be lost and not in the house. EDWARDS added things got thrown out and lost when TE left his house.

SA FITZELL provided EDWARDS a warning under Title 18,

FD-302a (Rev. 10-6-95)

50-BA-110763

Continuation of FD-302 of _____ALFRED EDWARDS JR._____ , On 02/25/2010 , Page 4

U.S. Code, Section 1001, and told him that lying to federal Agents would be a separate, chargeable offense. After being given the admonishment, EDWARDS said the passport might possibly be located in the house and he would probably know where to start looking for it.

When asked who ERSKINE COOPER was, EDWARDS said COOPER was a friend of his, who he met at a bowling alley five to six years ago. In addition, COOPER was a tenant of EDWARDS (residing at EDWARDS' house before DAVID's death). COOPER stayed at EDWARDS' residence for approximately a year and paid a rent of $700.00 a month. COOPER resided in the residence the same time as TE. He rented a downstairs room and shared a bathroom with TE and DAVID.

When asked about the existence of a contract between EDWARDS, GE, and TE, EDWARDS said "[I] vaguely remember" a contract. EDWARDS said in reality, there was no contract because he had no intention of enforcing the contract's terms. EDWARDS did not know where a copy of the contract was located and said GE wrote the contract. When asked the purpose of the contract, EDWARDS did not provide an answer. When EDWARDS was told TE thought she would owe a $20,000.00 debt to EDWARDS and GE if she left their residence, EDWARDS said somebody reading the contract might also have the same impression.

EDWARDS did not recall ever threatening TE with collecting a $20,000.00 payment from her if she left. EDWARDS said he never contacted TE's family in the Philippines to tell them they now owed EDWARDS $20,000.00 because TE left his residence. EDWARDS was unsure if GE discussed the $20,000 contract with TE's family members in the Philippines.

EDWARDS said he knew some money was being sent to TE's family in the Philippines and it was in varied amounts. EDWARDS said money was wired to TE's family members in the Philippines.

EDWARDS said both he and GE owned property in the Philippines. GE owned property in Tondo, Manilla (on Biak-Na-Bafo Street) and TE's family was residing in the apartment there.

EDWARDS traveled to the Philippines in March of 2009 with a friend, GARY WAYNES. WAYNES was interested in marrying a Filipino and traveled with EDWARDS for the purpose of meeting some women. EDWARDS traveled to the Philippines in order to check on a real estate purchase he made in the Philippines. EDWARDS said his

FD-302a (Rev. 10-6-95)

50-BA-110763

Continuation of FD-302 of ____ALFRED EDWARDS JR._____ , On 02/25/2010 , Page 5

property purchase was in dispute and he hired an attorney in the Philippines to deal with the matter.  EDWARDS described the property as an undeveloped, five-acre parcel of land.

While in the Philippines, GARY WAYNES became friends with TE's daughter, CECILE.

When asked to provide his e-mail address, EDWARDS wrote the following: and said he did not share the password to the account with anyone, but his wife would probably know it.

EDWARDS helped TE obtain a divorce from REID and put her in touch with Catholic Charities.  EDWARDS helped file documents for TE with U.S. Immigration officials in order for her to obtain her green card and a Filipino passport.  In addition, EDWARDS helped TE obtain Social Services in the United States.

EDWARDS said he heard from TE's family her "M.O." was to run away from time to time.  When asked if TE ever asked EDWARDS to give her passport and immigration papers to her, EDWARDS said TE wanted her papers from him, but (at the time of her request) he was still working on obtaining her green card, so he didn't have it in possession when she asked for it.  EDWARDS said TE contacted his neighbor, CASSANDRA NELSON, who lives across the street from EDWARDS, and NELSON told EDWARDS TE wanted her immigration papers.  EDWARDS told NELSON he did not have a green card for TE yet as it was still being processed at the time.  EDWARDS told TE (through NELSON) she was free to leave at any time, but (since he did not have a green card for her yet) she would be illegal if she left.

EDWARDS said GE was holding TE's passport at the time, but he did not know the reason why she was doing it.

When she returned to the residence, TE threatened to tell a social worker that both GE and GE's mother were kicking her.  EDWARDS said TE's accusations were false.

EDWARDS also remembered telling TE she could go, but if her passport expired, it would not be good for her.  EDWARDS said he and GE placed no conditions on TE for her to return to his home.

EDWARDS may have thrown a party for TE when her green card finally arrived.  EDWARDS told TE she was free to go if she

FD-302a (Rev. 10-6-95)

50-BA-110763

Continuation of FD-502 of _____ ALFRED EDWARDS JR. _____ , On 02/25/2010 , Page ___6___

wanted to.  EDWARDS said TE told him she would never leave again and was not running away.  EDWARDS was under the impression he could hold TE's immigration papers for her since she had no intention of leaving at that time.

EDWARDS denied TE ever asking him for her papers back and said TE had them in her possession when she traveled to the Philippines.  EDWARDS said he never threatened TE or witnessed anybody else threaten TE with violence or by withholding her immigration papers.  EDWARDS did not understand why TE accused GE and his mother-in-law of kicking her because he never heard of anything about it until the first time she ran away.

EDWARDS maintained close contacts with TE's family in the Philippines.  EDWARDS was helping to send TE's daughter, ERICA, to nursing school and he would talk with her on the phone to see how she was doing.  EDWARDS was very disappointed when he found out ERICA was pregnant.  EDWARDS also speaks with TE's daughter, CECILE, with SKYPE and by e-mail.

EDWARDS said when TE called on 12/22/2009, she said she was in Maryland and asked to speak with GE.  EDWARDS gave the phone to GE.  When asked if he was helping any other families in the Philippines to come to the United States, EDWARDS said he was not helping any other families.

EDWARDS said he is a retired physician.

0002



FD-302 (Rev. 10-6-95)

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription   02/26/2010

ALFRED EDWARDS, JR. (hereafter, EDWARDS) reviewed the inventory of items seized pursuant to the search warrant in the presence of FBI Special Agents (SAs) Mia Winkley and Brian J. Fitzell.  During the review, EDWARDS discussed the following:

When asked by SA Winkley if EDWARDS wished to modify or add to his prior statement, EDWARDS answered, "Whatever happens, I guess we'll discuss in court."  SA Winkley then departed the dining room.

EDWARDS told SA Fitzell he would get an attorney and SA Fitzell asked EDWARDS to have his attorney contact SA Winkley.

SA Christy A. Shaffer entered the dining room and (at EDWARDS' request) provided EDWARDS with copies of two emails (which had been shown to EDWARDS during his first interview, before EDWARDS had his glasses) for review.  The first email was sent from                                on or about 12/23/2009 to                          EDWARDS said, "I recognize this," when he read the email and said he wrote and sent the message.  After reviewing the second email, sent from                                   to                          on or about 09/11/2009, EDWARDS said, "I think my wife sent this one."  EDWARDS placed his initials and dated the copies shown to him.  SA Shaffer then departed the dining room.

When SA Winkley returned to the dining room, EDWARDS said he felt he "was in the dark" regarding the specifics of the case and would get an attorney to contact the FBI.  SA Winkley told EDWARDS it was within his rights to get an attorney and the case involved forced labor and holding identity documents.  EDWARDS answered, "This was no forced labor, so that is not a problem." EDWARDS added, Tess said [in regard to her identity/immigration documents], "I'm not going anyplace, so you hold them."

EDWARDS asked SA Winkley if he [EDWARDS] would "own" the documents if he was the individual who filled out the applications and paid all of the fees for filing the paperwork on Tess' behalf. SA Winkley told EDWARDS his was a legal question which she would research for him by contacting the Department of Justice Attorneys with whom she is working.  EDWARDS clarified by stating, "I am not

---

Investigation on    02/25/2010    at  Upper Marlboro

Date dictated   NA

File #  50-BA-110763

by     SA Mia Winkley, SA Christy A. Shaffer
       SA Brian J. Fitzell

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

00025

FD-302a (Rev. 10-6-95)

50-BA-110763

Continuation of FD-302 of ___ALFRED EDWARDS, JR._____ , On _02/25/2010_ , Page __2__

> talking about [her] documents [passport and green card], but the
> documents leading up to the documents.  I filled them out and paid
> the fees."

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   02/26/2010

       The following time line applies to significant interactions between FBI Special Agent (SA) Brian J. Fitzell and ALFRED EDWARDS, JR. (hereafter, EDWARDS), during the execution of a search warrant at his (EDWARDS') residence.  All times noted are in Eastern Standard Time (EST).

| Time | Event |
|------|-------|
| 11:16 am | At approximately 11:16 am, EDWARDS was advised by SA Mia Winkley of the existence of a federal search warrant authorizing Agents to search EDWARDS' residence.  A copy of the search warrant was provided to EDWARDS by SA Winkley while EDWARDS and SA Fitzell were seated in the dining room [Room C in search photos]. |
| 11:22 am | EDWARDS and SA Fitzell go upstairs and retrieved EDWARDS' eyeglasses from the master bedroom [Room F in search photos].  The glasses were located on top of the bed coverings.  SA Fitzell and EDWARDS returned to the dining room.  When SA Fitzell asked EDWARDS to point out the location of TERISITA EDWARDS' (hereafter, TE) immigration documentation and passport, EDWARDS said, "Give me five minutes." |
| 11:25 am | SA Fitzell advised EDWARDS he was free to leave his residence at any time during the execution of the search warrant.  EDWARDS answered, "I'll be here." |
| 12:00 pm | At approximately 12:00 pm, EDWARDS and SA Fitzell go upstairs to EDWARDS' office [Room K in search photos].  EDWARDS pointed out the location of the three handguns he owns.  The guns were located in the left filing cabinet, bottom drawer.  EDWARDS and SA Fitzell returned to the office several minutes later and EDWARDS pointed out the location of TE's passport and "green card."  The documents were located in the same filing cabinet as EDWARDS' guns, in the uppermost drawer, front left.  [Pertinent search photo: IMGP0494.JPG attached and made part of this record]. |

Investigation on   02/25/2010   at Upper Marlboro, Maryland

File #   50-BA-110763 - 47                                   Date dictated   NA

by   SA Brian J. Fitzell

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

00027

FD-302a (Rev. 10-6-95)

50-BA-110763

Continuation of FD-302 of ___ALFRED EDWARDS, JR._____, On 02/25/2010 , Page ___2___

12:41 pm   SA Fitzell asked for consent to search EDWARDS' home
           computers. EDWARDS said, "there is nothing on them,"
           and does not provide consent for the FBI to search or
           seize his computers.

12:50 pm   SA Fitzell and EDWARDS go upstairs to the master
           bedroom [Room F in search photos] and EDWARDS pointed
           out a cardboard box containing documents which EDWARDS
           said were related to TE's immigration documentation.
           The box was located on the corner of a tabletop on the
           left side of the bed, as one faces the head of the
           bed [Pertinent search photo: IMGP0486.JPG attached and
           made part of this record]. SA Fitzell and EDWARDS
           returned to EDWARDS' office [Room K in search photos].
           EDWARDS pointed out a brownish, file folder on a shelf
           and said the folder contained documents related to TE.
           [Pertinent search photo: IMGP0531.JPG attached and made
           part of this record].

2:18 pm    SA Fitzell and SA Winkley provided EDWARDS with a copy
           of the inventory of items seized pursuant to the search
           warrant.

2:39 pm    All law enforcement personnel vacate EDWARDS' residence.

—



EDWARDS POINTED THIS OUT AS LOCATION OF TE PASSPORT

SEARCH PHOTOS WALK COH
IMG PO494.JPG.

EDWARDS POINTED THIS OUT AS LOCATION OF THREE (3) handguns.

00029



BOX POINTED OUT BY
EDWARDS.

SEARCH PHOTOS WORK
COPY IMGP0486.JPG

00031



SEARCH PHOTOS
WORK COPY
IMG.POS31.JP~.

FICE FOLDER
POINTED OUT
BY EDWARDS

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    02/26/2010

GLORIA EDWARDS, born                was advised of the identity of
the interviewing agent and the purpose of the interview.    U.S.
Immigration and Customs Enforcement, Special Agent Kate N. Reilly
was present during the interview.   EDWARDS' mother ANITA TAFALLA
remained in the vicinity of the interview.   EDWARDS was asked if
she needed a Tagalog interpreter.   EDWARDS responded that she did
not and speaks and understands English.   EDWARDS provided the
following information:

EDWARDS advised that TERESITA EDWARDS (hereafter referred
to as TERESITA) were friends in the Philippines.   In 1999, they met
at an Officer's Club in Washington, D.C.   TERESITA asked EDWARDS to
help her because she needed a place to live.   EDWARDS explained
that TERESITA came to the U.S. to work as a nanny for JOCELYN
RAZZO.   RAZZO's son was born without an anus and was ill. RAZZO is
a Diplomat, who has home in the Philippines.

EDWARDS wanted to help TERESITA so she allowed TERESITA
to live with her and her husband ALFRED EDWARDS (hereafter referred
to as ALFRED.)   TERESITA lived with EDWARDS and met ALFRED's brother
DAVID EDWARDS (hereafter referred to as DAVID.)   DAVID visited
EDWARDS' home and met TERESITA.   DAVID and TERESITA decided to and
were married.

EDWARDS advised that TERESITA never told EDWARDS that she
was married to someone in the Philippines.   TERESITA also never
produced papers indicating that she was married in the Philippines.
EDWARDS learned that TERESITA was married in February 2009 when
ALFRED and a friend named GARY Last Name Unknown (LNU) traveled to
the Philippines.

ALFRED attempted to help TERESITA's daughter CECILE TAN
come to the U.S.   CECILE finished nursing school and GARY wanted to
meet her and other friends in the Philippines.   EDWARDS tried to
match GARY and CECILE.   ALFRED attempted to obtain a copy of
CECILE's birth certificate and learned that TERESITA was married to
BENJAMIN TAN.

When ALFRED told EDWARDS what he learned, it was the
first time EDWARDS heard that TERESITA was married. EDWARDS stated

Investigation on    02/25/2010    at Upper Marlboro, MD

File # 50-BA-110763                              Date dictated

by    MIA WINKLEY

This document contains neither recommendations nor conclusions of the FBI.   It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

00032

FD-302a (Rev. 10-6-95)

50-BA-110763

Continuation of FD-302 of ___GLORIA EDWARDS_____ , On 02/25/2010 , Page __2__

that after she learned about TERESITA's marriage to TAN, she never
asked TERESITA about the marriage.

EDWARDS aided TERESITA and her seven or eight children,
who live in the Philippines. TERESITA and her children lived in a
swatter area in the Philippines. EDWARDS took pity on them and
offered help to TERESITA, whom she considered family. EDWARDS hired
TERESITA to help clean her Philippine home.

While TERESITA was in the U.S., EDWARDS let the children
live at her mother's home in the Philippines. EDWARDS described
the home as a multi-level apartment which is in EDWARDS and her
sisters' name.

The children lived on one level and did not have to pay
rent to EDWARDS. CECILE managed the property and the children
collected and kept the rent money. They did not give the rent money
to EDWARDS. EDWARDS stated that children caused problems because a
son was gay and the youngest daughter was pregnant at the age of
seventeen.

EDWARDS stated she helped the children go to school and
some were put in nursing school. She did not pay to send the
children to school. EDWARDS advised that TERESITA sent money to
her children so they could go to school. EDWARDS provided a
contribution to better the children's lives by providing guidance
to the children on what to do, so they can have a nice life.

Occasionally the children complained that they needed
money and EDWARDS sent them $400 to $500 a month. When asked how
much money she sent and how often she sent the children money,
EDWARDS did not respond. EDWARDS could not explain how much money
she sent and/or how often she sent money to the children.

EDWARDS advised that the money was sent via Western Union
from the Sari Sari Store on Woodyard Road in Upper Marlboro, MD.
EDWARDS kept receipts of the transactions.

In August 2009, EDWARDS vacationed in Jerusalem. While on
vacation EDWARDS telephoned TERESITA who was "acting up." TERESITA
asked EDWARDS if she put TERESITA's blouse in the statue. When
TERESITA spoke to ALFRED, she was pleasant and told ALFRED that she
missed him.

00033

FD-302a (Rev. 10-6-95)

50-BA-110763

Continuation of FD-302 of _____GLORIA EDWARDS_____, On 02/25/2010 , Page ___3___

In August 2009, while EDWARDS were on vacation, they did not want to leave TERESITA alone in the home. EDWARDS' nephew attempted to pick up TERESITA; however, TERESITA was not home.

On August 22, 2009, EDWARDS' sister LOLITA O'DONNELL picked TERESITA up at EDWARDS' residence and took TERESITA to her home. O'DONNELL is a nurse. TERESITA stayed at O'DONNELL's residence for a while and then went to O'DONNELL's daughter MELISSA O'DONNELL's (hereafter referred to as MELISSA) residence.

MELISSA's husband is a doctor. MELISSA they threw a small party for TERESITA. TERESITA went missing from MELISSA's residence. When EDWARDS asked MELISSA what happened, they explained that someone picked TERESITA up.

EDWARDS was angry that TERESITA left. EDWARDS telephoned TERESITA's children regarding their mother. EDWARDS asked the children to explain why their mother left her home. The children told EDWARDS that they were not in touch with their mother.

EDWARDS stated that the children were liars and losers. EDWARDS got rid of the children and kicked them out of her Philippine apartment after their mother left. EDWARDS believed the children lied about their mother. She stated the children and their mother were snakes. CECILE told EDWARDS that her mother would contact them at Christmas.

On December 22, 2009, at approximately 6:30 p.m., TERESITA telephoned EDWARDS at her home. EDWARDS was concerned and asked TERESITA where she was. TERESITA replied Maryland. TERESITA told EDWARDS that "DOC" (referring to ALFRED) "put" a gun on her. TERESITA also stated that EDWARDS "put" a knife on her.

When EDWARDS heard TERESITA's comments she cursed and called TERESITA a "snake" and a "no good cobra." EDWARDS stated other bad words to TERESITA and told TERESITA that she will see her in court.

After the conversation with TERESITA, EDWARDS told ALFRED to be ready for it. EDWARDS emailed CECILE and accused CECILE of speaking with her mother.

EDWARDS advised that "DOC" does not own a gun. When asked if ALFRED owned a gun, EDWARDS then stated that ALFRED had a gun; however, she has not seen it in a long time.

00034

FD-302a (Rev. 10-6-95)

50-BA-110763

Continuation of FD-302 of ___GLORIA EDWARDS_____ , On 02/25/2010 , Page  4

EDWARDS described TERESITA as ungrateful.  EDWARDS wished TERESITA would be punished in court.  EDWARDS could not find words to describe how she did not her best to help TERESITA.

EDWARDS paid for telephone cards and allowed TERESITA to use her computer so TERESITA could talk to her children.

EDWARDS stated that now that TERESITA is gone, she has piece of mind.  EDWARDS stated that TERESITA was a snake and wanted to see her in court.

EDWARDS advised that she never poked TERESITA with a knife.

EDWARDS was asked if she understood the questions. EDWARDS advised that she did.  Writer asked Federal Bureau of Investigation (FBI) Contract Linguist Imelda Zamaripa to be present during the interview, to ensure that EDWARDS understood the questions.  Writer advised EDWARDS that it was illegal and a criminal offense to provide false information to an FBI Agent and/or federal agent.  Writer explained that if EDWARDS did not understand any of the questions in English and/or if she had difficulty answering the questions in English, she should ask Zamaripa to translate the question in Tagalog for her. EDWARDS advised that she understood Writer's comments.

Writer asked EDWARDS if she wanted to correct and/or add information to her comments.  EDWARDS advised that she wanted to provide additional information.

EDWARDS advised that TERESITA lived with RAZZO in the Philippines and RAZZO petitioned for TERESITA to come to the U.S. RAZZO was a diplomat. EDWARDS paid RAZZO seven thousand dollars for TERESITA "to come here to America" as a nanny.

TERESITA was a nanny for RAZZO for less than one week. TERESITA flew to D.C. to meet EDWARDS. EDWARDS met TERESITA, RAZZO, RAZZO's husband, whose name EDWARDS could not recall, and RAZZO's mother MARION RAZZO at the airport.  EDWARDS gave RAZZO seven thousand dollars when she "got TERESITA from the airport." EDWARDS advised that was the extent of her help for TERESITA.

EDWARDS explained that while in the Philippines, ROSE ARIOLA handled paperwork for TERESITA's passport.  ARIOLA worked

FD-302a (Rev. 10-6-95)

50-BA-110763

Continuation of FD-302 of _____GLORIA EDWARDS_____ , On 02/25/2010 , Page ___5___

for the Philippine Bureau of Treasury.  ARIOLA was EDWARDS' friend,
who had connections.  EDWARDS did not pay ARIOLA for her
involvement.

EDWARDS advised that her father was a General in the
Philippine Army.

In the 1980s, EDWARDS helped her cousin (on her father's
side of her family) MARIETTA MENDOZA come the U.S. from the
Philippines.  EDWARDS helped MENDOZA with the aid of an employee
who had a job at the Philippine Embassy and the diplomat's office.
MENDOZA lived with EDWARDS for one month and met JOHN CORNELL.
EDWARDS brother NICK TAFALLA introduced CORNELL to MENDOZA.
MENDOZA married CORNELL and moved out of EDWARDS' home.

In the 1980s, EDWARDS also helped ANNABELLE LNU, who is
a relative come to the U.S.  EDWARDS worked with a woman at the
World Bank and paid her five to seven thousand dollars to help
bring ANNABELLE to the U.S. ANNABELLE lived with the EDWARDS for a
while.

EDWARDS was asked to explain what was the purpose of the
five to seven thousand dollar payments. EDWARDS stated that money
was the fee and did not provide additional information.

EDWARDS stated that TERESITA, MENDOZA and ANNABELLE "ran
away with no gratitude." They did not tell EDWARDS that they were
leaving.

EDWARDS added that she helped someone immigrate to Canada
from the Philippines.

EDWARDS advised that she never threatened TERESITA's
life.  She treated TERESITA like family. EDWARDS admitted that she
sometimes pushed TERESITA in a playful manner.

EDWARDS explained that TERESITA sometimes told her that
she did not want to "be here." EDWARDS told TERESITA that she
cannot write and/or read and questioned what TERESITA would do if
she left.

EDWARDS stated that TERESITA had a first grade education
and could read and write "only a little."  TERESITA could write her
name.

FD-302a (Rev. 10-6-95)

50-BA-110763

Continuation of FD-302 of ___GLORIA EDWARDS_____ , On _02/25/2010_ , Page ___6___

        EDWARDS tried to teach TERESITA to read and write in English.  EDWARDS advised that TERESITA could read English.  Writer asked if TERESITA could read correspondence and mail, to include mail from the United States Government. EDWARDS advised that TERESITA could read little words and correspondence.  Writer asked EDWARDS to provide examples of the types of word TERESITA was able to read. EDWARDS replied, "the," "house," "hotel" and "cat."

        EDWARDS then stated that TERESITA could not read letters.  EDWARDS "handled everything for her" to include letters and email.  EDWARDS explained that she read email to TERESITA from her children.

        EDWARDS stated that on occasion TERESITA "went crazy" and cursed her children, stating she wished they were dead.

        EDWARDS advised that she pitied TERESITA because TERESITA's husband BENJAMIN TAN mistreated her. TAN was a drunk and gambled.  EDWARDS explained that when TERESITA worked as a street vendor selling vegetable, TAN would kick her vegetables.  TAN forced TERESITA to have sex with him when she did not want to do so.  TAN left his family on occasion and treated them like hostages.  TAN threatened to burn their home down and TERESITA and her children were forced to sleep outside in fear that TAN would set them on fire.  TAN could not see and could not find employment as a tailor.

        EDWARDS described TERESITA's life in the Philippines as hard.  TERESITA and her children would ask EDWARDS for money and discarded newspapers. EDWARDS asked TERESITA why she needed the newspaper. TERESITA responded that they used the newspaper as a toilet.

        Writer asked EDWARDS if she knew TERESITA was married before 2009 and when did EDWARDS learn that TERESITA was married. EDWARDS advised that TERESITA told her she was married a long time ago.  She explained that when she attempted to bring TERESITA to the U.S., all of TERESITA's documents reflected her maiden name and TERESITA appeared single.

        Writer asked EDWARDS if there was any additional information she wanted to correct and/or provide.  EDWARDS responded, "that's it."

FD-302a (Rev. 10-6-95)

50-BA-110763

Continuation of FD-302 of ___GLORIA EDWARDS_____ , On 02/25/2010 , Page ___7___

EDWARDS was asked if TERESITA signed a contract with
EDWARDS.  EDWARDS advised that she never had a contract with
TERESITA for cleaning and/or anything else.

EDWARDS advised that TERESITA left on another occasion
prior to 2009. The first time TERESITA left, EDWARDS was in the
Philippines.  EDWARDS opined that since TERESITA left EDWARDS
twice, it was clear that she was "only after papers." EDWARDS added
that when TERESITA left the first time, she did not have any
concern for her husband DAVID. EDWARDS stated that because "she
ran" (referring to TERESITA) no one was available to take care of
DAVID (who was ill at the time). DAVID was sent to live with his
first wife.

EDWARDS stated that TERESITA ran away by telling ANITA
TAFALLA that she wanted to talk to the neighbors.  TERESITA ran
out of the EDWARDS' garage.

TERESITA was gone for approximately one week. EDWARDS
stated that TERESITA should have told them that she planned to
leave so they would know where she was.  EDWARDS stated that
TERESITA showed her no gratitude.

EDWARDS explained that TERESITA had no papers until she
married DAVID. Writer asked if TERESITA requested her
identification documents from EDWARDS.  EDWARDS advised that on
occasion, when TERESITA asked for the documents EDWARDS questioned
TERESITA and stated something to the effect of, "Where would you
use the documents?"

EDWARDS gave TERESITA her identity documents when they
traveled so TERESITA would have her identification available.
EDWARDS advised that TERESITA instructed EDWARDS to hold her
documents.

EDWARDS stated that during the December 20009 telephone
call, TERESITA asked EDWARDS for her papers.  EDWARDS told TERESITA
that she could get her papers when she saw EDWARDS in court. Writer
asked EDWARDS where were TERESITA's identity documents.  EDWARDS
instructed Writer to ask her husband about the location of the
documents.

After TERESITA left, EDWARDS' sisters told her to stop
helping people and use her resources to help their children.

00038

FD-302a (Rev. 10-6-95)

50-BA-110763

Continuation of FD-302 of ___GLORIA EDWARDS_____, On 02/25/2010 , Page ___8_

    EMMANUEL TAFALLA is EDWARDS' brother.  He lives in EDWARDS' home and works at Sibley Hospital.

    EDWARDS advised that her sister CHRISTINE WILLIAMS' husband BRUCE WILLIAM has caused problem for her.

    EDWARDS stated that she told Writer, "All the truth."

    EDWARDS was shown an email dated September 11, 2009 sent from            to Cecile MT. EDWARDS confirmed that        was her email address.  She was also shown an attachment to the email dated "9/10/2009" referencing "Cecile Tan, Josephine Tan, Daryl Tan and Ericson Tan."  EDWARDS advised that ALFRED wrote the attachment and she emailed it.

    After reviewing the email, EDWARDS advised that she emailed the attachment to TERESITA's children to let them know what was occurring and to have evidence that she and ALFRED helped "this fool, because you know how snakes are."  EDWARDS also sent the email to document the situation because TERESITA's intentions were unknown. EDWARDS may have sent an additional email to CECILE wherein EDWARDS told CECILE that her mother is a snake.

    When TERESITA left in 2009, EDWARDS reported TERESITA as a missing person to the police.  EDWARDS did not give the police the above described email as evidence.

    Writer asked EDWARDS why she considered TERESITA a snake. EDWARDS advised that TERESITA is a snake because EDWARDS helped her and TERESITA accused them of wrong doing.

    EDWARDS owns the Executive Travel Agency.

    Writer advised EDWARDS that a federal search warrant authorized the search of her home.

    After the search, EDWARDS approached writer and advised she wanted to add information to her statement.

    EDWARDS believed that TERESITA was mad at her and ALFRED because they kicked her son out of their apartment in the Philippines.  He was not clean and kept fighting with his sister. EDWARDS stated she asked TERESITA if it was okay to kick her son out her apartment and TERESITA agreed.

0003

FD-302a (Rev. 10-6-95)

50-BA-110763

Continuation of FD-302 of ___GLORIA EDWARDS_____ , On 02/25/2010 , Page 9

        EDWARDS advised that when she, TERESITA and ANITA TAFALLA
were in a Utah airport with TERESITA and TERESITA began to cry.
TERESITA told EDWARDS that her uterus was falling.  EDWARDS spoke
with her husband, who is a medical doctor, about TERESITA's
condition.

        TERESITA was diagnosed with a medical condition that
require surgery.  EDWARDS obtained medicare assistance for TERESITA
to help pay for the surgery.  TERESITA refused to have surgery
because she wanted to have the operation in the Philippines.

        Writer asked EDWARDS if she made TERESITA sign a contract
and what was the purpose of the contract. EDWARDS explained that
she made TERESITA sign a contract.  The contract stated that
TERESITA would stay with EDWARDS.

        Writer again advised EDWARDS that it was in violation of
federal law to provide false information to a federal law
enforcement officer. Writer advised EDWARDS that she knew EDWARDS
was lying.

        EDWARDS then advised that the contract stated TERESITA
could not leave the EDWARDS without finding someone to replace her
and if TERESITA left without a replacement she would owe EDWARDS
twenty thousand dollars. EDWARDS advised that money was for the
heartache EDWARDS went through.  EDWARDS could not remember when
the contract was created and signed.  She did not recall if she or
ALFRED drafted the contract.

        EDWARDS advised that she and ALFRED own rental property
in Washington, D.C.

        EDWARDS stated she had nothing to add and/or correct to
her comments to Writer. EDWARDS stated that she did not threaten to
harm and did not harm TERESITA.  EDWARDS stated that she wanted to
see TERESITA in court.

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    12/23/2009

At approximately 5:57 p.m., TERESITA EDWARDS, born
spoke with GLORIA EDWARDS and ALFRED EDWARDS via a
cellular telephone.  EDWARDS used a telephone provided by
Immigration Customs Enforcement (ICE), Special Agent EDWARD KELLY
who dialed telephone number (301) 856-6005.

EDWARDS' Attorney, Martina Vandenberg, Jenner & Block,
1099 New York Avenue, NW, Ste. 900, Washington, D.C., (202) 639-
6000, ICE Special Agents KELLY and KATE REILLY and Federal Bureau
of Investigation, Special Agent MIA WINKLEY and Contract Linguist
IMELDA ZAMARIPA were present during the telephone call.

EDWARDS conducted the conversation with GLORIA EDWARDS in
Tagalog.  The conversation was monitored by ZAMARIPA.

The recording was maintained as evidence by Special Agent
KELLY.

Investigation on   12/22/2009   at   Calverton, MD

File #  50-BA-110763                        Date dictated

by   MIA WINKLEY

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

00069